# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30574

United States Court of Appeals
Fifth Circuit

**FILED**

June 5, 2018

Lyle W. Cayce
Clerk

SHELITA TUCKER,

Plaintiff - Appellant

v.

UNITED PARCEL SERVICE, INCORPORATED,

Defendant – Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:15-CV-611

Before JOLLY, JONES, and HAYNES, Circuit Judges.

PER CURIAM:*

Shelita Tucker appeals the grant of summary judgment in favor of her employer, United Parcel Service, Inc., ("UPS") on her hostile work environment and constructive discharge claims under Title VII of the Civil Rights Act of 1964 and the Louisiana Employment Discrimination Law.[1]  For the reasons explained below, we AFFIRM the district court's dismissal of her claims.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] The summary judgment order also dismissed retaliation claims, but Tucker does not challenge the dismissal of those claims on appeal.

No. 17-30574

## I. Background

Tucker worked for UPS as a local sort supervisor at the Port Allen, Louisiana facility from 2012 to 2015. She was responsible for making sure all of the incoming packages were sorted and then loaded for delivery at the end of the night. She also had authority to discipline her subordinates, though the full scope of that authority is unclear from the record. One of her subordinates was Larry McCaleb, a union employee whose responsibilities included unloading the package cars when needed. Tucker alleges that McCaleb sexually harassed her for approximately two years, from August 2012 through July 2014. The most severe act of alleged harassment occurred on July 24, 2014, when Tucker claims that McCaleb pressed his penis against her backside. Shortly thereafter, Tucker found the business manager, Darin Williams, and told him what happened. Williams immediately had Tucker write a statement, told her McCaleb had been taken out of service pending an investigation, and offered her the opportunity to leave for the evening, which she accepted.

Tucker's written statement says that the July 24 incident occurred when she was unloading a package car after noticing there were no unloaders around. As she was unloading, McCaleb entered the package car and told her he was going to finish the job. Tucker instructed him to unload one of the other cars and turned back around to continue her work. When she began unloading the car again, McCaleb "walked up behind [her] and pushed his private area (penis) into [her] backside." Tucker immediately turned around and McCaleb was "right up on [her]." She told him "you better back up off of me right now!" In response, McCaleb "threw his hands up in the air and said 'alright' then he backed up and walked out of the truck." Later that night McCaleb also gave a statement to Williams and reportedly said that he inadvertently bumped into Tucker.

No. 17-30574

The next day, Friday, July 25, Tucker initiated a complaint with the UPS Compliance Line. The call notes indicate that after describing the alleged offense and an earlier incident of verbal harassment, Tucker expressed concerns about whether McCaleb would be present at work and that she did not want to see him again. Williams had been advised by the labor manager that, without witnesses to the incident, he could not stop McCaleb from returning to work. When Tucker showed up for work she was notified of McCaleb's presence. To avoid any additional conflict, Williams gave Tucker the day off with full pay. The following week, Tucker took a scheduled vacation and filed a report against McCaleb with the Port Allen Police Department.

While Tucker was on vacation, UPS commenced an investigation into the matter and, apparently operating on new information from labor management, suspended McCaleb pending the investigation's outcome. UPS was unable to confirm whether McCaleb's conduct was intentional. Thus, after a nearly two week suspension, McCaleb was permitted to return to work. UPS took corrective action by meeting with McCaleb about the investigation, counseling him about workplace policies on professionalism and harassment, and ultimately prohibiting him from going to the work area where Tucker was assigned. About two months after his return, on October 15, 2014, McCaleb was convicted of simple battery for the incident and sentenced to ninety days in jail, one-year supervised release, and ordered to pay a fine plus court costs and a supervision fee. UPS did not take any additional action against McCaleb.

Tucker said that McCaleb never spoke to her or touched her again. There was one instance where he entered her work area, but Tucker reported him, UPS addressed it, and it never happened again. Nevertheless, Tucker notified her supervisors that she felt unsafe at work because McCaleb was in the facility, she would see him outside of her work area, and he would stare at her

3

in a way that felt intimidating. However, Tucker testified that she was still able to perform her duties while at work, even though she "didn't feel like [she] could really perform" because she was "constantly looking over [her] shoulder" and felt "completely out of [her] element" and embarrassed. In an effort to help her feel safe, UPS provided someone to walk Tucker to her car and offered her opportunities to transfer to another facility ten minutes away, or to change her shift by taking a new position, but she declined. According to Tucker, when she asked whether McCaleb could be transferred to another shift or location, UPS told her the union would not allow it.[2]

On October 30, 2014, Tucker sent an email about McCaleb to the Area Human Resources Manager, Wilfred Edwards, following up on a conversation from a week earlier. She explained that McCaleb continued to stare at her and position himself near the building's exit so that she would have to walk past him, and, on one occasion, he walked directly behind her as she exited the building. However, Tucker testified that McCaleb "never approached [her] in the parking lot as [she was] walking in or out." In this email she requested that McCaleb be removed from the facility immediately.

Tucker took the next day off, and then over the weekend decided not to return the following Monday because she "couldn't take it anymore." Tucker took medical leave, and then tendered her resignation through her attorney after she found another job. In her resignation letter, dated February 20, 2015, Tucker's attorney said she resigned because "UPS failed to move her harasser from her place of employment." Tucker never received a response regarding

---

[2] Evidence shows that the collective bargaining agreement allowed shift changes for union employees only when there was a job opening, and when there was an opening it required UPS to (1) advertise the position, (2) allow union employees to bid on the available position, and (3) offer the position to the bidder with the most seniority. McCaleb testified that he was not interested in changing his shift. The labor group informed human resources that the only options were discipline or termination. UPS concluded that the information gathered from its investigation did not support termination.

No. 17-30574

the October 30 email to Edwards because she could not get emails outside of work.

After filing her EEOC charge on January 29, 2015, and receiving a right-to-sue letter, Tucker filed this lawsuit against UPS, alleging a hostile work environment based on sexual harassment, constructive discharge, and retaliation claims under federal and state law. The district court granted summary judgment to UPS on all claims. Tucker now appeals the summary judgment as to her hostile work environment and constructive discharge claims.

## II. Standard of Review

We review a grant of summary judgment de novo, applying the same standard as the district court. *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003)). "Summary judgment is appropriate if the moving party can show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). After considering the evidence in the light most favorable to the non-movant, "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial." *Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 433 (5th Cir. 2005) (quoting *Steadman v. Tex. Rangers,* 179 F.3d 360, 366 (5th Cir. 1999)).

## III. Discussion

### A. Hostile Work Environment Claim

Tucker alleged that McCaleb harassed her over the course of nearly two years, beginning in August 2012 and ending in July 2014. In addition to the July 24 incident, the alleged harassment consisted of sexually suggestive

comments, seductive staring, laughing at her rebukes, and scaring her. No one disputes that Tucker can only recover for acts occurring within the 300 days preceding the date she filed her EEOC charge, unless the continuing violation doctrine applies. Under the continuing violation doctrine,

> (1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."

*Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 738 (5th Cir. 2017) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)).

The district court first determined that the incidents prior to November 2012 did not constitute continuing violations because "intervening action by UPS sever[ed] the acts that preceded it from those subsequent to it." It next concluded that it would be inequitable for Tucker to hold UPS liable under the continuing violation doctrine for the incidents from November 2012 through 2013 because "Tucker admitted that she had the ability to discipline [McCaleb], and yet, she failed to do so in connection with any of the alleged acts of sexual harassment in 2012 and 2013." Tucker does not challenge the first determination, and thus waives any argument that incidents prior to November 2012 constitute continuing violations. *See Douglas W. ex rel. Jason D. W. v. Hous. Indep. Sch. Dist.*, 158 F.3d 205, 210 n.4 (5th Cir. 1998). As to the incidents from November 2012 through 2013, Tucker merely asserts in a conclusory fashion that no equitable consideration should prevent the court from considering the full scope of McCaleb's behavior. However, she fails to

discuss the district court's determination that her failure to exercise any authority to discipline McCaleb bars consideration of those claims. Even if we were to consider this argument sufficiently briefed, we would affirm the district court's determination because we perceive no error in its assessment of the facts or the exercise of its equitable powers. *See Heath*, 850 F.3d at 739 (noting that the continuing violation theory furthers Title VII's purpose of "encourag[ing] employees to work with employers and to take advantage of other mechanisms for obtaining relief from ongoing harassment" prior to filing an EEOC charge).

Therefore, only two incidents of alleged harassment remain for our consideration: (1) the July 24 incident previously discussed and (2) a June 2014 incident where McCaleb "was lurking in the pitch black darkness between two trailers and responded to Ms. Tucker's question to another employee." To establish her prima facie case of a hostile work environment based on sexual harassment, Tucker must show that

> (1) she belongs to a protected class; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) [UPS] knew or should have known of the harassment and failed to take remedial action.[3]

*Cain v. Blackwell*, 246 F.3d 758, 760 (5th Cir. 2001). Harassment must be "severe or pervasive" enough to create an abusive working environment in order for the plaintiff to recover. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008).

---

[3] McCaleb raised both federal and state law claims, but the outcome is not different here between the two. We rely on Title VII law when interpreting Louisiana's anti-discrimination law. *Nichols v. Lewis Grocer*, 138 F.3d 563, 566 (5th Cir. 1998); *see also Tanner v. LSU Fireman Training Program*, 254 F.3d 1082, 2001 WL 564147, at *2 (5th Cir. 2001) (per curiam) (unpublished).

The district court determined that the alleged harassment was not sufficiently severe or pervasive and that UPS took prompt remedial action. We pretermit this issue because, even assuming without deciding that the alleged harassment was sufficiently severe and that UPS should have known that McCaleb intentionally committed the July 24 offense based on his subsequent conviction, we hold that UPS took sufficient remedial action to avoid liability under Title VII.

"A defendant may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant." *Williams-Boldware v. Denton Cty.*, 741 F.3d 635, 640 (5th Cir. 2014).[4]  The remedial action must be "reasonably calculated" to put an end to the harassment. *See id.*  It is not necessary for employers to utilize the severest sanction against the offending employee in order to demonstrate "prompt remedial action." *Id.*; *see also Landgraf v. USI Film Prod.*, 968 F.2d 427, 430 (5th Cir. 1992) ("Title VII does not require that an employer use the most serious sanction available to punish an offender . . . ."). Where the incidents of harassment do not involve "a protracted outpouring of . . . invidious harassment that require[] large-scale institutional reform," the employer is only "required to implement prompt remedial measures to prevent [the harasser], and anyone else, from engaging in [the complained of] harassing conduct toward [the victim]." *Williams-Boldware*, 741 F.3d at 641.

---

[4]  Because Tucker was harassed by someone who was not her supervisor, the fifth prong is part of the equation. *See Watts v. Kroger Co.*, 170 F.3d 505, 509 & n.3 (5th Cir. 1999). Under these circumstances, the fifth prong is necessary to establish vicarious liability. *See id.* at 509.  When, on the other hand, the alleged harasser is a supervisor with immediate or successive authority over the victim, the fifth prong is unnecessary because the employer is subject to vicarious liability for hostile work environments created by that supervisor. *See id.* (citing *Burlington Ind. v. Ellerth,* 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)).

In *Skidmore v. Precision Printing & Packaging., Inc.*, evidence showed that the harasser subjected the victim to "constant sexual remarks," "sometimes came up behind her and licked or kissed her face or neck," "pull[ed] her waist to his if she bent over," and "once put his hands around her neck as if to choke her when she confronted him about his behavior." 188 F.3d 606, 611, 613 (5th Cir. 1999). Co-workers testified that the harassment was "constant." *Id.* at 615. When notified of the harassment, the employer instructed the harasser to leave the victim alone and no longer scheduled the victim to work the same shift as him. *Id.* at 611. Thereafter, the harasser never touched or spoke to the victim again. *Id.* Nevertheless, the victim alleged that she continued to feel uncomfortable at work because the harasser "leered" at her and was present in common work areas, and employees at work began to ostracize her after learning of her allegations. *Id.* She further testified to severe mental suffering as a result of the harassment, was diagnosed with post-traumatic stress disorder, and was recommended at least a year of psychiatric treatment. *Id.* at 612. We held that the employer's response "constitute[d] 'prompt remedial action' as a matter of law" because the harasser's "conduct ceased its offensive nature," despite the fact that no investigation was made until after the EEOC complaint was filed, the harasser was never reprimanded, and no follow-up inquiry was made to determine whether the harassment had ended. *Id.* at 616.

Here, we hold that that the undisputed evidence shows as a matter of law that UPS took prompt remedial action sufficient to avoid Title VII liability because it immediately took action to protect Tucker while the investigation was pending, and then following the investigation it moved Tucker to a separate work area, instructed McCaleb not to enter that work area, counseled McCaleb on its sexual harassment and professionalism policies, provided an escort to help Tucker feel safer, and the sexual harassment ceased. *See id.;*

*Boldware*, 741 F.3d at 642 (holding that the employer took sufficient remedial action when it "took seriously the [victim's] complaints and its remedial efforts effectively halted the racially harassing conduct of which she complained"); *Harvill*, 433 F.3d at 437, 439 (holding that the employer took sufficient remedial action to end sexual harassment of an employee fondling the victim's breasts numerous times and pressing his body against the victim from behind, among other things, because the employer "acted swiftly in taking remedial measures" by separating the employees "and the harassment ceased"); *see also Caudillo v. Cont'l Bank/Bank of Am. Illinois*, 191 F.3d 455, 1999 WL 542899, at *1, *4 (7th Cir. 1999) (unpublished) (holding that the employer took prompt remedial action to end sexual harassment of an employee rubbing his penis against the victim's backside while she was working,[5] among other things, because the harasser was instructed to avoid contact with the victim, counseled on ending the harassment, the victim was reassigned to a cubicle to minimize contact with the employee, and the harassment ceased despite subsequent staring from the employee). Therefore, we affirm the district court's summary judgment in favor of UPS on the hostile work environment claim.

B. <u>Constructive Discharge Claim</u>

Tucker argues that she was constructively discharged because (1) UPS never punished McCaleb, (2) she was subjected to McCaleb's presence at work, (3) UPS took no additional action to stop the harassment after McCaleb's conviction, and (4) UPS punished her by providing an escort to her vehicle at night, offering her an opportunity to switch jobs and facilities as an accommodation, and reprimanding her for missing work after McCaleb's trial.

---

[5] *See Caudillo v. Cont'l Bank/Bank of Am. Illinois*, No. 97 C 884, 1998 WL 409406, at *1 (N.D. Ill. July 16, 1998), *aff'd*, 191 F.3d 455 (7th Cir. 1999).

"To survive summary judgment on a constructive discharge claim, the plaintiff must provide evidence that working conditions were 'so intolerable that a reasonable employee in her position would [have felt] compelled to resign.'" *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 331 (5th Cir. 2004) (quoting *Webb v. Cardiothoracic Surgery Assocs. of N. Tex.,* 139 F.3d 532, 539 (5th Cir. 1998)). This requires "aggravating factors" resulting in "a greater degree of harassment than is required for a hostile work environment claim." *Id.* at 331–32. The following actions are considered aggravating factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 331–32.

We agree with the district court that Tucker failed to discharge her burden to raise a fact issue in this regard. UPS's remedial actions stopped the sexual harassment, and McCaleb neither spoke to nor touched Tucker again. Although McCaleb's presence at work made her feel uncomfortable, Tucker said she was still able to perform her duties. The subsequent conduct complained of by Tucker does not constitute an aggravating factor and did not result in a greater degree of harassment than a hostile work environment, and thus cannot form the basis of a constructive discharge claim. *See id.* at 332 (holding that the plaintiff could not survive summary judgment on her constructive discharge claim because she merely alleged harassment but no aggravating factor, and the employer's remedial measures ended the sexual harassment); *cf. Barnett v. Boeing Co.*, 306 F. App'x 875, 879 (5th Cir. 2009) (per curiam) (holding that the plaintiff failed to show a hostile work

11

environment where the harasser "leered at [her], touched her in sexually inappropriate and unwelcome ways, and allegedly actively intimidated her after she complained of his actions").

AFFIRMED.